IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
CHATTANOOGA DIVISION

DONNA R. POE,                               )
                                            )
            Plaintiff,                      )
                                            )
v.                                          )    No.1:17-CV-202
                                            )
BRUNSWICK CORPORATION,                      )
d/b/a BRUNSWICK BOAT GROUP,                 )
                                            )
            Defendant.                      )

## MEMORANDUM OPINION

This civil action is before the Court for consideration of Defendant's motion for summary judgment. [Doc. 30]. Plaintiff has not responded, and the time for doing so has passed. *See* E.D. Tenn. L.R. 7.1(a).[1] Oral argument is unnecessary, and the motion is ripe for the Court's determination.

Plaintiff has filed suit pursuant to the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4-21-101 *et seq*., and the Tennessee Disability Act ("TDA"), Tenn. Code Ann. §§ 8-50-103 *et seq*., for alleged discrimination based upon her age and disability. Plaintiff further asserts causes of action under Tennessee law for retaliatory

---

[1] Notably, on April 19, 2019, the initial deadline for Plaintiff's response, Plaintiff's counsel filed a motion for an extension of time to file a response, requesting a two-week extension, through May 3, 2019, to file a response to Defendant's motion for summary judgment [doc. 34]. On May 1, 2019, this Court granted the motion for an extension of time, and ordered Plaintiff to file her response no later than May 3, 2019 [doc. 35]. Nonetheless, Plaintiff has not filed a response, nor a request for any further extension of time.

discharge after filing a worker's compensation claim, and for intentional infliction of emotional distress. For the reasons that follow, the motion will be granted and the case will be dismissed.

## I.  BACKGROUND

Plaintiff Donna Poe began working for Brunswick (also known as Sea Ray) in 1985, at their Vonore Tellico plant, which produces boats. [Doc. 31-1 at 7]. In the last few years of her employment, Poe worked as a "quality control technician" or "quality assurance assembly final rack inspector" and was responsible for inspecting completed boats. [*Id.* at 7-8]. The primary duties of her job were to verify that boats were built to hard copy specifications, ensure all equipment and components were installed or loaded in a boat, build the owner's packet and complete all necessary paperwork, and enter all findings and variables into the quality database. [*Id.* at 8; Doc. 31-2 at 1]. The rack inspection is the final inspection of the boat before it ships, and by signing off on a rack inspection, the inspector is verifying that all critical checks have been completed and any defects have been resolved. [Doc. 32 at 3]

On September 14, 2010, Poe signed an "Acknowledgement of the Employee Handbook," which confirmed that she was provided a copy of the Sea Ray employee handbook, had read the handbook, and agreed with the guidelines, processes, and procedures. [Doc. 31-1 at 9; Doc. 31-3 at 1]. However, Poe states that she had only read parts of the handbook at that time. [Doc. 31-1 at 9]. The handbook contained a section on "Discharge Violations," which listed types of conduct that "may and normally will subject an employee to immediate involuntary discharge," including "repeated unsatisfactory job

performance or quality of work." [Doc. 31-1 at 9-10; Doc. 31-4 at 1]. The handbook also provides that, if an employee disagrees with the outcome of the disciplinary action taken at any step, they can appeal the action to the review board. [Doc. 31-1 at 10; Doc. 31-4 at 1]. Poe states that she was not aware of this review process, although it was in the employee handbook, which she had available to her. [Doc. 31-1 at 10]. Because she was not aware of the process, Poe never requested a review of any disciplinary decision. [*Id.*].

Steve Lyons, a quality manager at the plant in Poe's chain of command, signed a disciplinary report regarding incidents involving Poe in July 2015. [Doc. 31-1 at 15; Doc. 31-5 at 1]. Poe's direct supervisor at that time was Mitch Trent, who reported to Lyons. [Doc. 31-1 at 15]. In July 2015, Poe had a good working relationship with Lyons, who was around 50 years old. Poe never heard Lyons make any comment suggesting he had a problem with her age, or anyone else's age. [*Id.*].

The report on Poe's July 2015 disciplinary action states that, on July 16, 2015, Brunswick was notified by a dealer that a boat had been sent from the factory without hooking up the fuel fill hose and vent hose, which resulted in a significant fuel spill into the bilge and ski locker of the boat. [Doc. 31-1 at 16; Doc. 31-5 at 1; Doc. 32 at 4]. If these hoses are not properly attached, when someone puts fuel in the boat, it will go into the gas tank, and then begin spilling down the side of the boat, into the bilge, and the bottom area of the boat, which Poe admits, can create a safety hazard. [Doc. 31-1 at 16]. The document states that Poe signed off on the boat as complete without the mandatory end of line quality assurance pressure checks required, but Poe disputes whether she failed to conduct these tests. [*Id.* at 16-17; Doc. 31-5 at 1]. Poe states that, at that time, no one in

the plant was correctly checking the fuel lines. [Doc. 31-1 at 17]. In fact, the disciplinary record states that, due to the severity of the failure, the company audited all fuel-related work instructions and revised those instructions. [*Id.*; Doc. 31-5 at 1]. Specifically, Brunswick added a construction record sign off in which the inspector would have to indicate the time and the pressure used for the pressure test, as well as a pressure check label which would be on the boat to show the pressure check verification. [Doc. 31-1 at 18; Doc. 32 at 4-5].

The report goes on to state that on July 29, 2015, it was brought to Brunswick's attention that Poe recorded a boat as complete on the construction record without the mandatory fuel system sign off required by the new procedures. [Doc. 31-1 at 18; Doc. 31-5 at 1]. The document states that Poe questioned whether the sign off occurred before the changes were implemented, but Lyons noted that this was not the case. The document stated that, after looking into the issue, it was a "fireable" offense, and Poe agreed that if someone failed to make those checks they could be fired for it. The document further states that Jorge Felix, vice president of manufacturing, recommended that Poe be terminated. [*Id.*].

Per Brunswick's disciplinary policy in the employee handbook, Poe's July 2015 incidents were discussed by a review board comprised of Alicia Harris, Plant Manager Mike Fritts, Human Resources Manager Lee Haniford, Engineering Manager Jonathan Converse, and Assembly Manager Simon Monaghan. [Doc. 32 at 5]. The review board discussed the seriousness of the quality control error and concluded that it was grounds for termination, but, given the length of Poe's employment tenure, the review board decided

to issue her a final warning, along with a suspension. [Doc. 32 at 5-6]. The disciplinary record reflects that the review board felt that, given Poe's history as an employee, she should be given a final warning with a three-day unpaid suspension, but that any further quality issues would result in her termination. [Doc. 31-1 at 18; Doc. 31-5 at 1]. Poe signed off on a change of employee status form which recounted the two July incidents, provided the dates of suspension, and stated that "any further violation may result in additional discipline including termination." [Doc. 31-7 at 1]. Poe signed the change of employee status form, but did not agree with it. [Doc. 31-1 at 19]. She signed the document because Lyons took her into a room with a human resources employee and asked why she would want to kill someone, comparing the situation to the death of Poe's son. [*Id.*].

Poe states that she does not contend that her warning and suspension regarding issues in July of 2015 were issued because of her age. [*Id.*]. However, she felt that it was unfair because no one else in her department was faulted for the failure except her. [*Id.* at 19-20].

In October 2015, Poe injured her left ankle while working, after she stepped into a boat to inspect something and her foot fell through a hole that had been covered with carpet. [Doc. 31-1 at 20; Doc. 31-6 at 1]. When she injured herself, she told her supervisor, Trent, who helped her to the nurse's station. [Doc. 31-1 at 20]. After she injured her ankle, she never went on leave and had no lost time as a result of the injury. [*Id.* at 24]. Instead, she had to show up to work and sit in an office, although she was not provided with any additional duties to perform in the office. [*Id.*]. At some point around the holiday season of 2015, Poe was allowed to resume her inspection duties but had some restrictions on how

many hours a day she could work and whether she could climb into boats. [*Id*. at 25]. In February 2016, Poe resumed full duty, but wore an ACE bandage for a little support. [*Id*. at 25, 33]/

At some point before June 2016, Harris replaced Lyons as the quality manager above Poe. [Doc. 31-1 at 22]. Prior to the discipline that Poe received in June 2016, she rarely talked to Harris, and never heard Harris make a comment about anyone's age. Regarding Poe's worker's compensation claim and ankle injury, Harris told Poe "we will be thankful when you get off of your restrictions and you can come back full time." Poe never heard Harris make any negative comments about her workers' compensation claim or anyone else's workers' compensation claim. [*Id*.].

Trent, however, would make comments that he would be glad when Poe got off of workers' compensation duty, because he needed her back doing her job. [*Id*. at 22-23]. Trent would also get irritated because he would have to come pick Poe up in the parking lot with a golf cart due to her ankle injury. [*Id*. at 23]. When she resumed full duty in February 2016, Trent put her over a job inspecting the cruising boats, which she had no knowledge of, rather than putting her back to her normal job, but she received the same pay and benefits. Additionally, Poe was sick with pneumonia in 2016, and, when she returned to work, Trent asked her when she was going to retire. Poe told Trent that she was not going to retire until she had to, and said that she was going to be tested for possible lung cancer, to which Trent responded that he needed to know now because he needed to get someone in and trained before she left, mentioning that Poe was 60 years old. Poe stated that she felt like Trent wanted her out of the company because she was still on

workers' compensation and it was "like [she] was a burden." [*Id*.]. Poe did not report Trent's comments to anyone, because she did not know if they were good or bad. [*Id*. at 24].

Poe also stated that Lyons had made a negative comment when she injured her ankle at work in October 2015, specifically, stating that he wished she had not injured herself because he needed her as an inspector on the floor and it "looked bad on him." [*Id*. at 16]. Poe also stated that Lyons tried to get her to use her vacation time while she was injured, so that it would not be held against the company for purposes of workers' compensation. However, her ankle injury occurred in October 2015, and, at the time of her July 2015 discipline, Lyons had not made any of the alleged comments about her ankle. [*Id*.]. Moreover, after Lyons tried to get Poe to use her vacation time, she asked a human resources employee if she had to do so, and was told that she did not, so she did not use her vacation time. [*Id*. at 39]. However, Poe did not believe that Lyons was a person trying to push her out of the company. [*Id*. at 16].

A June 2016 writeup, signed by Harris, indicates that on June 3, 2016, Brunswick was notified by Prince William Marina, once of its largest independent dealers, that they received a boat from the Vonore Tellico facility without a steering wheel. [Doc. 31-1 at 26; Doc. 31-8 at 1; Doc. 32 at 6]. The document states that an investigation revealed that three employees did not follow proper procedures, leading to the boat leaving the facility without a steering wheel: Ben Reynolds, a functional test inspector, Danny Lynn, a member of management, and Poe. [Doc. 31-1 at 26-27; Doc. 31-8 at 1].

Poe estimated that Reynolds was in his early 30s; and the records indicate that his birthdate is February 10, 1975, meaning he was 41 years' old at the time of the incident. [Doc. 31-1 at 26; Doc. 32 at 7]. She stated that Reynolds had performance warnings "all of the time," and was moved to the functional test unit because he had so many issues in the lake test unit. [Doc. 31-1 at 26]. Poe was informed of this by James Blankenship, another inspector who took Reynold's lake inspection job. [*Id*. at 27]. Poe stated that she asked Harris if Reynolds was disciplined as a result of the June 2016 incident, and was informed that Reynolds was not disciplined because he did his job correctly. [*Id*.]. However, in her affidavit, Harris states that, at the time of the June 2016 incident, Reynolds was not on "final warning status," although he had received a verbal warning nine months earlier for an attendance-related issue, and the review board decided to take the next step in the progressive discipline process and issue Reynolds a written warning for his error. [Doc. 32 at 7-8].

Poe estimated that Lynn was in his 50s, and the records indicate that his date of birth is January 5, 1960, meaning that he was 56 at the time of the incident. [Doc. 31-1 at 27; Doc. 32 at 7]. Poe was not aware if any discipline was issued to Lynn as a result of the June 2016 incident. [Doc. 31-1 at 28]. She was also unsure whether Lynn had any prior disciplinary history. [*Id*.].

As to Poe, the June 2016 writeup indicates that, as the rack inspector, she was required to verify that the steering wheel was installed. [Doc. 31-1 at 28; Doc. 31-8 at 1]. The writeup states that neither the steering wheel nor the tag was in the boat when it was signed off as complete by Poe. [Doc. 31-1 at 28; Doc. 31-8 at 1]. The writeup further

states that Poe was interviewed about the issue and admitted to the quality manager that she had not visually inspected the boat as required, but Poe contests whether this statement is true. [Doc. 31-1 at 28; Doc. 31-8 at 1]. The document states that management followed up with progressive discipline for each of the three employees, and, because Poe was on a last and final warning based on the July 2015 issues, she was terminated for poor job performance. [Doc. 31-8 at 1].

On the day that Poe was notified of her termination, she had returned to the plant at 12:30 p.m. after a doctor's appointment. [Doc. 31-1 at 28]. She took her report from the doctor to the nurse, and went back out onto the floor, when Harris stepped out around 4:30 p.m. and asked to speak to her. [*Id*. at 29-30]. Previously, Poe had given Larry Holsonback, a human resources employee, some forms regarding use of medical family leave to have cataract surgery on her eyes, and Poe thought Harris wanted to discuss the medical leave. [*Id*.]. Instead, Harris informed Poe that she had been terminated because she had let a boat go out without a steering wheel. [*Id*. at 30]. Poe asked to see the construction record paperwork, and Harris informed her that it did not matter, because she was terminated. [*Id*.]. At the meeting, Poe refused to sign the change of employee status form. [*Id*.; Doc. 31-9 at 1].

At the time of her termination, the reason she was given for the termination was that she did not follow proper production procedures as trained which resulted in sub-standard product being shipped. [Doc. 31-1 at 32; Doc. 32-8 at 1]. No one at Brunswick ever told her any different reason for her termination. [Doc. 31-1 at 32]. Additionally, at the time that she was terminated, Poe was back on full duty after her ankle injury. [*Id*. at 33].

Although Poe felt that Trent had made numerous negative comments about her, she admits that Trent was not present at her termination meeting, his name was not on any of the documents relating to her termination, and she was not aware of any facts suggesting that Trent recommended her termination. [*Id*. at 31].

Poe states that she is not "saying that they terminated [her] because [she] got hurt," but felt like after her injury Brunswick was finding a way to terminate her. [*Id*. at 36]. Poe named three other individuals, Dixie Queen, Jerry Holt, and Annette Kirkland, that she believed were terminated by Brunswick because of injuries. [*Id*. at 36-37]. Queen, who is about the same age as Poe, was let go seven or eight years ago because they no longer had a job that she could do, after she got run over by a tugger and had significant injuries to her ankle and leg. [*Id*. at 37]. Holt was 63 years old and was let go six or seven years ago for taking a "Nitro," which was medication his doctor had prescribed him after heart surgery. Brunswick's position was that Holt could not take the medication at work. Poe stated that her understanding was that Holt was fired because he did not go to Brunswick's doctor. [*Id*.]. Kirkland was around 50 years old and was let go two years prior after she was run over by a golf cart at work resulting in many surgeries, including brain surgeries, and had to go on long-term disability. [*Id*. at 37-38].

In an affidavit, Larry Holsonback, a human resources employee, stated that Queen was employed by Brunswick from 1991 until 2009, and filed a claim for workers' compensation benefits in 2007. [Doc. 33 at 1]. He states that Queen was laid off due to a lack of work. [*Id*.]. Additionally, Holsonback stated that Kirkland was employed by Brunswick from 1994 to 2017, and filed a claim for workers' compensation benefits in

2013. [*Id*. at 2]. Kirkland was deemed to have voluntarily resigned her employment when she was unable to return to work due to an extended leave of absence. [*Id*.]. Separation paperwork for both Queen and Kirkland supports Holsonback's affidavit. [*Id*. at 3-4].

Poe stated that the only health impairments that she contends were a basis for Brunswick's decision to discipline or terminate her were her ankle injury and her lung problems, because each year she would have pneumonia and have to take a week or two off work. [Doc. 31-1 at 40]. Trent made comments about her taking time off with pneumonia in 2016, saying that he wished she would get over the pneumonia because he needed her as an inspector. However, neither Holsonback or Harris ever discussed Poe's health issues with her, and she never heard either of those individuals make any comment about her age, or anyone else's age. [*Id*.]. Harris states in her affidavit that Trent was not a member of the review board and had no involvement in the July 2015 or June 2016 decisions to issue Poe discipline or terminate her employment, nor did he provide any input as to those decisions. [Doc. 32 at 8]. However, Poe stated that Trent and Harris communicated frequently. [Doc. 31-1 at 45].

Poe stated that, after she was terminated, Blankenship, who is in his late 30s, took over her inspection duties. [Doc. 31-1 at 41]. She knew this because after her termination meeting, Blankenship was in her station, and told her that Harris had told him that he was taking over Poe's position. [*Id*.]. However, Harris states that, immediately after Poe's termination, Trent (born 1965) and Phil Lively (born 1961) took over Poe's prior duties. [Doc. 32 at 8]. The next three individuals to fill Poe's prior position were Rita Boles (born 1981), Ryan Taylor (born 1993), and Gretta Roach (born 1979). [Doc. 32 at 8-9]. Poe

admitted that, when she left Brunswick, she knew other employees who were still there in their 60s or older. [Doc. 31-1 at 42]. She could not think of anyone in their 60s or otherwise that she thought Brunswick had terminated because of their age. [*Id*. at 43].

## II.  STANDARD OF REVIEW

Defendant's motion is brought pursuant to Federal Rule of Civil Procedure 56, which governs summary judgment. Rule 56(a) sets forth the standards governing summary judgment and provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(c)(1)(A). Rule 56(c)(1)(B) allows a party to "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Moreover,

mere conclusory and unsupported allegations, rooted in speculation, are insufficient to meet this burden. *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).

To defeat a motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id*. at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id*. at 251-52.

Under Federal Rule of Civil Procedure 56(e), if a party fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the motion and may grant summary judgment if the motion and supporting materials show that the movant is entitled to it. Fed. R. Civ. P. 56(e). Here, despite requesting an extension of time to respond to the motion for summary judgment, Plaintiff has not responded, and the extended deadline for a response has long passed. Accordingly, the Court will consider the facts presented by Defendant, to the extent that they are supported by the evidentiary materials submitted with the motion, as undisputed.

## III.  ANALYSIS

### A. Age Discrimination

As an initial matter, in her deposition, Plaintiff stated that she did not contend that her disciplinary action and suspension in July 2015 was because of her age. [*See* doc. 31-1 at 19]. Accordingly, the Court will address Plaintiff's age discrimination claim only as it relates to Poe's June 2016 termination.

Plaintiff's claim for age discrimination is brought pursuant to the THRA, "a comprehensive anti-discrimination law, which is intended to further the policies embodied in the similar federal laws against employment discrimination." *Johnson v. Collins & Aikman Auto. Interiors, Inc.*, No. 1:02-cv-365, 2004 WL 1854171, at *3 (E.D. Tenn. Feb. 26, 2004) (internal quotation marks omitted). The statute provides, in relevant part, that it is a discriminatory practice for an employer to "[f]ail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin." Tenn. Code Ann. § 4-21-401(a)(1).

The stated purpose of the THRA is to "[p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964 . . . and the Age Discrimination in Employment Act of 1967[.]" Tenn. Code Ann. § 4-21-101(a)(1). Thus, courts "apply the same analysis to age-discrimination claims brought under the THRA as those brought under the" Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*. *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 620 (6th Cir. 2006). Therefore, under both the THRA and the ADEA, a plaintiff "must prove by a preponderance of the evidence . . . that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177-78 (2009).

## 1. *Prima Facie* Case

The Sixth Circuit applies the burden-shifting framework of *McDonnell Douglas*[2] for analyzing ADEA claims based on circumstantial evidence. *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009). To establish a *prima facie* case of age discrimination, using the *McDonnell Douglas* framework, a plaintiff must demonstrate that "(1) [s]he is a member of the protected class, that is, [s]he is at least forty years of age; (2) [s]he was subjected to an adverse employment action; (3) [s]he was qualified for the position; and (4) [s]he was treated differently from similarly situated employees outside the protected class." *Briggs v. Potter*, 463 F.3d 507, 514 (6th Cir. 2006) (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004)). Once plaintiff makes this showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* If the defendant makes the necessary showing, the burden shifts back to the plaintiff "to show that the employer's proffered reason was mere pretext for intentional age discrimination." *Harris v. Metro. Gov't of Nashville and Davidson Cnty, Tenn.*, 594 F.3d 476, 485 (6th Cir. 2010). "The plaintiff retains the ultimate burden of proving that 'age was the 'but-for' cause of the employer's adverse action.'" *Id.* (quoting *Gross*, 557 U.S. at 178).

Plaintiff can clearly establish the first three factors of the *prima facie* case. The problem for Plaintiff arises in establishing the fourth prong of the *prima facie* showing,

---

[2] *McDonnell Douglas Corp. v. Greene*, 411 U.S. 792 (1973).

demonstrating that she was treated differently than similarly situated employees outside of the protected class.

Plaintiff has presented no evidence that similarly situated employees who were not in her protected class were treated differently. With regard to the June 2016 incident that led to Plaintiff's termination, Plaintiff admits that, one of the two other individuals named in the discipline documentation, Lynn, was in his 50s, and therefore, in the same protected class. [*See* doc. 31-1 at 27]. Plaintiff was not aware of Lynn receiving any discipline for his part in the steering wheel incident. [*See id*. at 28]. As to the second employee involved, Reynolds, although Plaintiff estimated that Reynolds was in his 30s, the records indicate that Reynolds was 41 years old at the time of the June 2016 incident, and accordingly, Reynolds also fell within Plaintiff's protected class. [*See* doc. 31-1 at 26; doc. 32 at 7]. Accordingly, the only evidence that could possibly be construed as an attempt to show this fourth element of a *prima facie* case of age discrimination merely shows that two individuals, both of whom fell within the same protected class, were not terminated for their involvement in the June 2016 steering wheel incident. Moreover, the Court notes that, in her deposition, Plaintiff admitted that she could not think of any other employees that had been terminated because of their age, and she knew other employees still working at the Vonore Tellico plant who were in their 60s or older. [*See* doc. 31-1 at 42-43].

Because Plaintiff has not shown that she was treated differently than similarly situated employees outside of the protected class, and instead, the undisputed record shows that other individuals in Plaintiff's protected class were not terminated for the same conduct, Plaintiff has not established a *prima facie* claim of age discrimination.

16

## 2. Legitimate, Non-Discriminatory Reason

Assuming *arguendo* that Plaintiff could establish a *prima facie* case of age discrimination, the burden then shifts to the Defendant to show a legitimate, non-discriminatory reason for its adverse employment action. *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 342 (6th Cir. 1997). The Defendant is not required to persuade the court that it was actually motivated by the proffered reasons; it is sufficient that the Defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Defendant has met this burden. Plaintiff was terminated for poor job performance, after she signed off on a boat as complete without a steering wheel installed, while already on final warning status resulting from signing off on two boats without completing the required fuel pressure checks.

## 3. Pretext

Once Defendant has stated a legitimate, non-discriminatory reason for its adverse action, the burden shifts to Plaintiff to show that Defendant's proffered reason is a pretext for discrimination. *Kline*, 128 F.3d at 342-43. This burden merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination. *Burdine*, 450 U.S. at 256. "[P]laintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994), abrogated on other grounds by *Gross*, 557 U.S. at 167.

With regard to pretext, the Sixth Circuit has stated:

> To raise a genuine issue of material fact on the validity of an employer's explanation for an adverse job action, the plaintiff must show, again by a preponderance of the evidence, either (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the action; or (3) that they were insufficient to motivate the action.

*Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996).  To prove pretext, Plaintiff "must produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendants intentionally discriminated against" her.  *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (internal quotation marks and alterations omitted).  At all times, the ultimate burden of persuasion remains with the Plaintiff.  *Burdine*, 450 U.S. at 253.

Plaintiff arguably alleges that Defendant's proffered reason for her termination, namely, her poor job performance, had no basis in fact and did not actually motivate her termination.  Plaintiff does not argue that Defendant's proffered reason was insufficient to motivate her termination.

### a. No Basis in Fact

The inquiry as to whether the plaintiff has established pretext by a showing that the defendant's legitimate, non-discriminatory reason for termination has no basis in fact is not whether the facts underlying the employer's adverse action are disputed, but "whether defendant's proffered reason for terminating plaintiff has any basis in fact."  *Mastellone v. Publix Super Markets, Inc.*, 179 F. Supp. 3d 784, 794 (E.D. Tenn. 2016).  The Sixth Circuit had adopted an "honest belief" rule with regard to an employer's proffered reason for a termination, under which, "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that

the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). Thus, "an employer is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590-91 (6th Cir. 2014) (internal quotation marks omitted). For the employer's belief to be honestly held, the employer must have "reasonably relied" on the particular facts before it at the time, and the employer is not required to use the most optimal decisional process or leave no stone unturned in its investigation. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).

One of Plaintiff's primary arguments is that, although she was accused of signing off on a boat that was missing a steering wheel, she did not actually do so. However, in light of the honest belief rule, her argument that she did not sign off on an incomplete boat is insufficient to show pretext, because the evidence indicates that Defendant honestly believed that Plaintiff had signed off on the completion paperwork for a boat that was then shipped to the customer without a steering wheel.

The undisputed facts show that in early June, 2016, Defendant received an e-mail from Prince William Marina, one of its customers, that it had received a boat from the Vonore Tellico facility that was missing a steering wheel. [*See* doc. 31-1 at 26, doc. 31-8 at 1, doc. 32 at 6]. Defendant investigated the matter, and determined that three employees, including Poe, were responsible for the oversight. [*See* doc. 31-1 at 26-27, doc. 31-8 at 1]. Poe admits that her job duties included completing the final inspection of boats and signing off on a rack inspection. [*See* doc. 32 at 3]. Plaintiff contests whether she actually signed

off on the boat without the steering wheel, and vigorously denies admitting to such. [*See* doc. 31-1 at 28; doc. 31-8 at 1]. However, Plaintiff in no way indicates that Defendant failed to investigate the matter, or that Defendant's investigation was so lacking that it could not be reasonably relied upon. Thus, the undisputed facts before the Court show that Defendant reasonably relied on the information before it in determining that Plaintiff was partially responsible for the boat leaving the facility without a steering wheel.

Accordingly, even if Plaintiff could prove that she did not actually sign off on a boat as complete when it was missing a steering wheel, she nonetheless cannot show that defendant's legitimate, non-discriminatory reason is pretextual because it is not based in fact. *See Majewski*, 274 F.3d at 1117.

b. Did Not Actually Motivate the Termination

For a plaintiff to prove pretext under the second method, she must admit the factual basis underlying the employer's proffered explanation and further admit that such conduct could motivate dismissal. *Chattman v. Toho Tenax America, Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). Under this method, the plaintiff must show "that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer*, 29 F.3d at 1084. The honest belief rule does not apply when the plaintiff relies on the second method of showing pretext, that the stated reason did not actually motivate her termination. *Joostberns v. United Parcel Serv.*, 166 F. App'x 783, 794 n.5 (6th Cir. 2006).

Notably, Plaintiff does not admit the factual basis of Defendant's proffered reason, because she denies that she signed off on the boat without a steering wheel attached.

However, even if Plaintiff did admit the factual basis, she nonetheless has not shown that this reason did not actually motivate her termination.

The only circumstantial evidence of age discrimination present in this case is a statement from Plaintiff's immediate supervisor, Trent, asking when Plaintiff planned to retire, and informing her that he needed to know soon if she intended to retire, to find and train a replacement. [*See* doc. 31-1 at 23]. However, the undisputed evidence shows that Trent was not a member of the review board and had no involvement or input in Plaintiff's termination. [*See* doc. 32 at 8]. This evidence alone falls far short of Plaintiff's required showing that the "sheer weight or circumstantial evidence" makes it "more likely than not" that Defendant's legitimate, non-discriminatory reason for termination was pretext. Given that there is no other circumstantial evidence to support any argument that the true reason for Plaintiff's termination was her age, no genuine issue of material fact exists as to whether Plaintiff has shown that Defendant's reason for her termination was pretextual.

In sum, the Court finds that no genuine issue of material fact exists as to Plaintiff's age discrimination claim, and therefore, the Court will grant summary judgment in Defendant's favor as to this claim.

**B. Disability Discrimination**

As an initial matter, the Court notes that, in her complaint, as to her claim for disability discrimination under the TDA, Plaintiff recites only that she had a disability, and does not specify what that disability was. [*See* doc. 1-1 at 6]. In the factual section of the complaint, the only possible disability mentioned by Plaintiff is an ankle injury sustained while on the job. [*See id*. at 3]. The ankle injury is the only potential disability discussed

by Defendant in its motion for summary judgment.  [*See* doc. 31 at 20-22].  Accordingly, the Court will limit its discussion of Plaintiff's disability discrimination claim to this alleged disability.[3]

The TDA prohibits private employers from discriminating against employees "based solely upon any physical, mental or visual disability of the applicant, unless such disability to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved."  Tenn. Code Ann. § 8-50-103(b).  "A claim brought under the THA [Tennessee Handicap Act, now known as the TDA] is analyzed under the same principles as those utilized for the Americans with Disabilities Act."  *Cardenas–Meade v. Pfizer, Inc.*, 510 F. App'x 367, 369 n. 2 (6th Cir. 2013) (quoting *Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W.3d 579, 584 (Tenn. Ct. App. 2004)).

Under the ADA, to make out a *prima facie* case for discriminatory discharge, Plaintiff must demonstrate that: (1) she is disabled; (2) she is otherwise qualified for the position with or without a reasonable accommodation; (3) she suffered an adverse employment decision; (4) her employer knew or had reason to know of her disability; and (5) her position remained open.  *Cash v. Siegel–Robert, Inc.*, 548 F. App'x 330, 335 (6th Cir.

---

[3] The Court is aware that, in her deposition, Plaintiff mentioned that she suffered from lung problems, which she asserted could have been a factor in her termination.  [*See* doc. 31-1 at 40].  However, Plaintiff never mentioned any lung disease in her complaint, never amended her complaint to include this fact, and never responded to the pending motion for summary judgment to provide her argument as to this issue.  Accordingly, the Court concludes that Plaintiff's mention of this alleged disability in her deposition, without any reference to it in any of her court filings, is insufficient to raise it as an issue before this Court.

2013) (citing *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 449 (6th Cir. 1999)). Furthermore, the plaintiff's disability must be a "but for" cause of the adverse employment action. *Tennial v. United Parcel Serv.*, 840 F.3d 292, 306 (6th Cir. 2016) (citing *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc)).

The plaintiff may establish the first prong of the *prima facie* case if the plaintiff (1) has a physical or mental impairment that substantially limits one or more of the plaintiff's major life activities (i.e., "actually disabled"); (2) the plaintiff has a record of such impairment; or (3) the plaintiff is regarded by an employer as having such an impairment ("regarded as disabled"). *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (citing *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999)) (internal quotation marks omitted); *see also* 42 U.S.C. §§ 12102(1)(A)–(C). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

## a. Whether Plaintiff was Disabled

"When determining whether an individual is substantially limited in performing a major life activity, courts should consider three factors: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment, and (3) the permanent or long-term impact of the impairment." *Cardenas-Meade v. Pfizer, Inc.*, 510 F. App'x 367, 370 (6th Cir. 2013) (quoting *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 581 (6th Cir. 2007)). Thus, the impairment's impact must be permanent or, at least, long-term, 29 C.F.R. §§ 1630.2(j)(2)(ii)-(iii), and it is insufficient for individuals attempting to prove

disability status to "merely submit evidence of a medical diagnosis of an impairment." *Bennett v. Nissan North America, Inc.*, 315 S.W.3d 832, 844 (Tenn. Ct. App. 2009) (citing *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002)). Disability discrimination laws "do not apply to 'impairments that are transitory and minor,' which includes 'an impairment with an actual or expected duration of 6 months or less.'" *Id*. at 845 (quoting 42 U.S.C. § 12102(3)).

Here, Plaintiff's ankle injury was too temporary in nature to qualify as a disability under Tennessee law. Plaintiff first injured her ankle in October 2015. [*See* doc. 31-1 at 20; doc. 31-6 at 1]. In either December 2015 or January 2016, Plaintiff was able to resume her inspection duties, but had some restrictions involving the hours that she could work and whether she could climb into boats. [*See* doc. 31-1 at 25]. Plaintiff resumed her full duties in February 2016, but continued to wear an ACE bandage for support. [*See id*. at 25, 33]. Accordingly, from the time of Plaintiff's injury, in October 2015, until the time that she returned to full work duty, in February 2016, approximately four months elapsed. Because the injury had a duration of less than six months, Plaintiff's ankle injury was "transitory and minor," and Tennessee's disability discrimination laws do not apply to the injury. *See Bennett*, 315 S.W.3d at 845.

Considering all of the factors, the Court concludes that: (1) Plaintiff's ankle injury was fairly minor, given that she was able to resume some work activities within two months, and all work activities within four months; (2) the duration of Plaintiff's ankle injury was minimal, with a total of four months from the date of injury to returning to full work duty; and (3) Plaintiff suffered minimal long-term impacts from the ankle injury. *See*

*Cardenas-Meade*, 510 F. App'x at 370. Accordingly, the Court concludes that Plaintiff was not actually disabled, within the meaning of the TDA.

b. Whether Plaintiff was Regarded as Disabled

An employee is "regarded as" disabled under the ADA if his or her employer (1) mistakenly believes that the employee has a physical impairment that substantially limits one or more major life activities, or (2) mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 893 (6th Cir. 2016); *see also* 42 U.S.C. § 12102(3)(A) ("[a]n individual meets the requirement of 'being regarded as having such an impairment if the individual . . . has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity"); 29 C.F.R. § 1630.2(g)(1)(iii) ("[b]eing regarded as having such an impairment . . . means that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both 'transitory and minor'"). "Thus, an individual may fall into the definition of one regarded as having a disability if an employer ascribes to that individual an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001).

Here, there is no evidence whatsoever to indicate that Defendant ascribed to Plaintiff an inability to perform the functions of her job, due to her ankle injury, at the time of her termination. *See id*. As discussed above, although Plaintiff was prevented from

completing her job duties for approximately two months, and then returned to her usual work duties with some limitations for approximately two more months, by the time Plaintiff was terminated she had returned to her full work duties, without limitations. Defendant was obviously aware that Plaintiff had been released by her doctor to resume her full work duties, and in fact, Plaintiff had resumed her full work duties for several months before her termination. Given this record, it is unclear how Defendant could have regarded Plaintiff as disabled at the time of her termination.

Because Plaintiff cannot show that she was disabled or that Defendant regarded her as disabled, under the undisputed facts in the record, the Court concludes that no genuine issue of material fact exists as to whether Plaintiff can establish the first factor of a *prima facie* claim of disability discrimination under the TDA. Moreover, even if Plaintiff could establish a *prima facie* claim of disability discrimination, as discussed previously, Defendant has shown a legitimate non-discriminatory reason for Plaintiff's termination, and Plaintiff cannot show that this reason is pretextual. Accordingly, the Court will grant summary judgment in Defendant's favor on this claim.

**C. Retaliatory Discharge**

Plaintiff also raises a common law claim of retaliation. To establish a *prima facie* claim for workers' compensation retaliatory discharge under Tennessee common law, the Plaintiff must prove the following:

(1) she was an employee of Defendant at the time of her injury;

(2) she made a claim against Defendant for worker's compensation benefits;

(3) Defendant terminated her employment; and

(4) the claim for workers' compensation benefits was a substantial factor in the employer's motivation to terminate her employment.

*Yardley v. Hosp. Housekeeping Sys., LLC*, 470 S.W.3d 800, 805 (Tenn. 2015). If a plaintiff makes a *prima facie* case of retaliation, the burden shifts to the defendant to prove a legitimate, non-pretextual, non-retaliatory reason for the termination. *Johnson v. Cargill, Inc.*, 984 S.W.2d 233, 234 (Tenn. Ct. App. 1998).

Plaintiff can clearly prove the first three elements of a *prima facie* case of workers' compensation retaliatory discharge. Thus, the question is whether there is a genuine issue of material fact as to the fourth element, namely, that her claim for workers' compensation benefits was a substantial factor in Defendant's decision to terminate her employment.

"In order to meet the substantial factor requirement, a plaintiff must show either direct or compelling circumstantial evidence of a causal connection between the workers' compensation claim and the termination, not just the fact that the latter followed the former." *Cooper v. Wyndham Vacation Resorts, Inc.*, 570 F. Supp. 2d 981, 985 (M.D. Tenn. 2008). Although temporal proximity alone is insufficient, temporal proximity plus other circumstantial evidence of causation can present a prima facie case of retaliation. *Id.* at 985-86. Factors including "the expression of a negative attitude by the employer toward an employee's injury, the employer's failure to adhere to established company policy, discriminatory treatment when compared to similarly situated employees, [or] sudden and marked changes in an employee's performance evaluations after a workers' compensation claim," combined with temporal proximity, could present sufficient circumstantial evidence of causation. *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 391 (Tenn. Ct. App.

2006). However, without additional evidence, "an employee's subjective belief or speculation that a causal connection exists will not defeat summary judgment." *Cooper*, 570 F. Supp. 2d at 986 (citing *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677, 685 (Tenn. Ct. App. 1999)).

Plaintiff has produced no direct evidence that her workers' compensation claim was a factor at all in Defendant's decision to terminate her employment, much less a substantial factor. Accordingly, Plaintiff must rely on the "compelling circumstantial evidence" theory to prove the fourth element of her *prima facie* case of retaliatory discharge. There is arguably a genuine issue of material fact as to whether there was sufficient temporal proximity between Plaintiff's October 2015 workers' compensation claim and her June 2016 termination to serve as circumstantial evidence of retaliatory discharge. However, even assuming that Plaintiff's termination was in close enough temporal proximity to her workers' compensation claim, circumstantial evidence of temporal proximity alone is insufficient without additional circumstantial evidence. *See Cooper*, 570 F. Supp. 2d at 985-86.

No additional factors, combined with the potential temporal proximity, constitute compelling circumstantial evidence to overcome the motion for summary judgment. First, Plaintiff undoubtedly would assert that Defendant expressed a negative attitude towards her ankle injury, for which she filed her workers' compensation claim. However, the undisputed facts show that the only persons to comment on Poe's ankle injury were her immediate supervisor, Trent, his supervisor, Harris, and Harris's predecessor, Lyons. Specifically, in her deposition Poe stated that Harris told her that the company would "be

thankful when [she got] off her restrictions and [she could] come back full time." [*See* doc. 31-1 at 22]. Poe stated that she never heard Harris make any comments about her workers' compensation claim. [*See id*.].

As to Trent, Poe stated that he also made comments that he would be glad when Poe got off her workers' compensation duty, because he needed her back on her regular job. [*See id.* at 22-23]. Poe also stated that Trent would occasionally become irritated that he had to pick Poe up in the parking lot with a golf cart when she arrived at work because of her ankle injury. [*See id*. at 23]. Poe stated that she felt like Trent wanted her out of the company because she was on workers' compensation and she felt like she "was a burden." [*See id*.]. However, Poe admits that she was unsure whether Trent's comments about her ankle injury were negative or positive. [*See id*. at 24]. Poe also stated that Lyons had stated that he wished she had not injured herself because he needed her as an inspector on the floor and it "looked bad on him," and also encouraged her to use her vacation time while she was injured, so that it would not be held against the company for purposes of workers' compensation. [*See id.* at 16]. Nonetheless, Poe stated that she did not believe that Lyons was trying to push her out of the company. [*See id.*].

This record is woefully inadequate to support a finding that Plaintiff's workers' compensation claim was a substantial factor in her termination. As Plaintiff herself admitted, the comments she recounts from Harris, Trent, and Lyons do not indicate a negative attitude towards Plaintiff's ankle injury, but rather, can be interpreted as merely reflecting well-wishes for a speedy recovery, and a desire to have Plaintiff back to work as soon as she is able. Plaintiff's conclusion from these statements that she felt "like [she]

was a burden," is precisely the type of subjective belief or speculation that cannot defeat summary judgment. *See Cooper*, 570 F. Supp. 2d at 986. Further, as to Lyons allegedly attempting to force Plaintiff to use her vacation time while she was injured, Plaintiff admitted that she was never forced to use her vacation time. Moreover, the record indicates that neither Trent nor Lyons were involved in the ultimate decision to terminate Plaintiff.

Second, Plaintiff has submitted no evidence that Defendant failed to adhere to established company policy. To the contrary, the undisputed evidence indicates that Defendant followed its own policy regarding employee discipline with regard to Plaintiff's ultimate termination. [*See* doc. 32 at 7-8].

Third, Plaintiff has alleged no facts supporting a conclusion that she received discriminatory treatment when compared to similarly situated individuals. Plaintiff provided two examples of other employees who she believes were terminated for filing workers' compensation claims: Dixie Queen and Annette Kirkland.[4] [*See* doc. 31-1 at 36-37]. However, Plaintiff's own deposition testimony indicates that the reason that each of these employees were terminated was something other than their filing of a workers' compensation claim. Plaintiff stated that Queen was terminated because Defendant no longer had a job that she could perform after suffering injuries to her leg and ankle. [*See id*. at 37]. Plaintiff also stated that Kirkland was terminated because she had to go on long-term disability. [*See id*. at 37-38]. The paperwork related to Queen and Kirkland's

---

[4] In her deposition, Plaintiff also mentions Jerry Holt, who she believes was terminated after he took a "Nitro" for his heart condition at work. [See doc. 31-1 at 37]. Although somewhat unclear, it appears that Mr. Holt did not file a workers' compensation claim, and, at the least, Plaintiff has not alleged such.

terminations support these reasons: Queen was laid off because there was no work for her and Kirkland was deemed to have voluntarily resigned when she was unable to work after an extended leave of absence. [*See* doc. 33]. Thus, the record clearly indicates that these individuals were not terminated for filing workers' compensation claims.

Finally, Plaintiff has not shown that there was a sudden and marked change in her performance evaluations after her workers' compensation claim. Plaintiff received a negative performance evaluation, and was placed on final warning status, in July 2015, several months before her ankle injury occurred, in October 2015. Accordingly, Plaintiff's June 2016 negative performance evaluation, resulting in her termination, was not a marked change in performance evaluations.

Thus, Plaintiff has not shown that a genuine issue of material fact exists as to any factor that could, combined with temporal proximity, meet the standard of showing compelling circumstantial evidence that her workers' compensation claim was a substantial factor in her termination. Accordingly, Plaintiff cannot establish a *prima facie* claim of retaliatory discharge under Tennessee common law. Moreover, even if Plaintiff could establish a *prima facie* claim of retaliatory discharge, as discussed previously, Defendant has shown a legitimate non-discriminatory reason for Plaintiff's termination, and Plaintiff cannot show that this reason is pretextual. Therefore, the Court will grant Defendant's motion for summary judgment as to this claim.

### D. Intentional Infliction of Emotional Distress

To be successful on a claim for intentional infliction of emotional distress under Tennessee law, a plaintiff must demonstrate "that the defendant's conduct was

(1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012). The second element is "an exacting standard requiring the plaintiff to show that the defendant's conduct is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized society.'" *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999) (quoting Restatement (2d) of Torts § 45, comment D (1965)). Even if a defendant's conduct is a violation of federal law, this fact alone is insufficient to support an intentional infliction of emotional distress claim. *Richardson v. CVS Corp.*, 207 F. Supp. 2d 733, 746 (E.D. Tenn. 2001).

No genuine issue of material fact exists as to whether Defendant's alleged conduct was so outrageous that it went beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable. Notably, this Court had granted summary judgment in Defendant's favor on all of Plaintiff's employment discrimination claims. Even if Plaintiff's employment discrimination claims survived summary judgment, however, this alone would not be sufficient to show conduct that was sufficiently outrageous. Plaintiff has alleged no additional facts, other than her allegations that Defendant violated the law in terminating her employment, that in any way indicate that Defendant engaged in outrageous conduct. Accordingly, the Court concludes that no genuine issue of material fact exists as to whether Defendant's conduct was sufficiently outrageous, and summary judgment will be granted as to this claim.

### 4. CONCLUSION

Accordingly, for the reasons stated herein, Defendant's motion for summary judgment will be granted, and the case will be dismissed. An order consistent with this opinion will be entered.

ENTER:

s/ Thomas W. Phillips
SENIOR UNITED STATES DISTRICT JUDGE